**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERICK HOFFMAN,** | : | **CIVIL ACTION NO. 1:05-CV-0906** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PATRICK DOUGHER, EUGENE** | : | |
| **MARZULLO, PETER PAPODOPOLOS,** | : | |
| **DONALD CUNNINGHAM, MICHAEL** | : | |
| **SHIPP, CHUCK HODGE, GREGORY** | : | |
| **A. GREEN, PETER SPEAKS, and** | : | |
| **RICHARD SHAFFER,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This is a § 1983 civil rights action filed by Erick Hoffman ("Hoffman"), a former employee of the Pennsylvania Department of General Services ("Department"). Hoffman alleges that nine Department employees[1] retaliated against him for exercising his First Amendment right to speak out on matters of public concern. Presently before the court is defendants' motion for summary judgment (Doc. 29), in which defendants contend that Hoffman has failed to proffer sufficient evidence to support his retaliation claim and that defendants' actions are

---

[1] The defendants are Department Secretary Donald Cunningham ("Cunningham"), Department Deputy Secretary Peter Speaks ("Speaks"), Department Human Resources Director Gregory Green ("Green"), Department Labor Relations Coordinator Chuck Hodge ("Hodge"), Capital Police Superintendent Richard Shaffer ("Shaffer"), Former Capital Police Superintendent Eugene Marzullo ("Marzullo"), and Capital Police Officers Patrick Dougher ("Dougher"), Peter Papodopolos ("Papodopolos"), and Michael Shipp ("Shipp"). (<u>See</u> Doc. 30 ¶¶ 4-9; Doc. 34 ¶¶ 4- 9.)

shielded by qualified immunity.  For the reasons that follow, the motion will be granted.

## I.     **Statement of Facts**[2]

Hoffman is a former employee of the Pennsylvania Capitol Police ("Capitol Police"), a division of the Department's Bureau of Police and Safety.  (Doc. 1 ¶ 26; Doc. 24 ¶ 26.)  Hoffman, who began his employment with the Capital Police in July 2002, alleges that a number of Department employees subjected him to a pattern of retaliatory conduct beginning as early as August 2002.  (Doc. 30 ¶ 2; Doc. 34 ¶ 2.)

Hoffman's allegations can be divided into seven distinct incidents, the first of which occurred in August 2002, when Shipp shoved Hoffman and informed him that he did not belong in the administrative area of the Capitol Police building.[3]

---

[2]  In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to plaintiff, the non-moving party.  See infra Part II.  Constructing the facts was rendered more difficult by Hoffman's denials of several facts on the ground that the facts refer to certain individuals' "mental impressions."  (See, e.g., Doc. 34 ¶¶ 16, 22-23, 38, 45, 49-50, 56-60, 63.)  While this may be an appropriate response to allegations in a pleading, see FED. R. CIV. P. 8(b), it is insufficient to sustain an objection to factual assertions drawn from competent evidence of record, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).  The court has conducted an independent review of the record, but where no evidence supports Hoffman's position, the court has accepted defendants' statement as true.  See L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); see also infra Part II.

[3]  This is Hoffman's only allegation of retaliatory conduct against Shipp, and Hoffman concedes that it is insufficient to establish a viable First Amendment claim because it was not preceded by a protected activity.  (See Doc. 33 at 19.)  Therefore, the court will grant defendants' motion for summary judgment with respect to the claim against Shipp without further discussion.

(Doc. 34, Ex. 1 at 37-39.)  Hoffman originally alleged that he reported this incident to Marzullo, who told Hoffman to "mind his own business."  (See Doc. 1 ¶ 29.) However, Hoffman now admits that he cannot recall whether he ever mentioned the incident to Marzullo.  (Doc. 34, Ex. 1 at 39.)

The second incident occurred in March 2003.  Hoffman participated in a union investigation regarding whether Dougher had been verbally abusive to another union member.  (Doc. 30 ¶ 14; Doc. 34 ¶ 14.)  Hoffman's duties during the investigation were to take witness statements and prepare an investigatory report. He was not required to make any conclusions about the punishment that should be imposed upon Dougher.  (Doc. 34, Ex. 1 at 40-43.)  After the investigation, Dougher allegedly made the following statements to Hoffman:  (1) "[Y]ou got [sic] to be careful with what you do around here; you know, if you stir things up, you could have problems down the road," and (2) "We know things about you and I can use them against you."  (Id. at 43-44; see also Doc. 30 ¶ 15; Doc. 34 ¶ 15.)[4]

The third incident occurred in June 2003 after Hoffman complained to Marzullo and Papodopolos about the practice of officers smoking in the lunch room. As a result of the complaints, the Department agreed to make the lunch room a non-smoking area.  (Doc. 30 ¶ 20; Doc. 34 ¶ 20.)  Thereafter, Marzullo allegedly told Hoffman:  "You made a lot of trouble with the smoking because we [have] a lot of smokers here, so you['d] better be careful working here."  (Doc. 34, Ex. 1 at 70.)

---

[4] Dougher denies Hoffman's allegations, claiming he was unaware that Hoffman had even played a role in the union investigation.  (Doc. 30, Ex. I ¶ 4.)

Hoffman began to receive written threats and cheese in his mailbox around the same time. (Doc. 30 ¶ 21; Doc. 34 ¶ 21.) Hoffman admits that he has no evidence to suggest who placed these items in his mailbox. (Doc. 34, Ex. 1 at 69, 71-72.)

The fourth incident occurred after Hoffman attended an officer survival training seminar conducted by a fellow Capitol Police officer on September 1, 2003. (Doc. 30 ¶ 24; Doc. 34 ¶ 24.) As part of the training seminar, participants were shown a video depicting an image of a woman with her breast exposed. (Doc. 30 ¶ 25; Doc. 34 ¶ 25.) The video had been previewed by Papodopolos, who was the shift supervisor. (Doc. 34, Ex. 1 at 73.) A participant reported the video's inappropriate content to the Department's Equal Employment Opportunity ("EEO") office. (Doc. 30 ¶ 25; Doc. 34 ¶ 25.) As a component of the EEO investigation, Hoffman was interviewed on September 9, 2003. (Doc. 30 ¶ 26; Doc. 34 ¶ 26 & Ex. 1 at 116.) He provided a written statement in which he denied observing any "inappropriate or offensive scenes" in the video, but recalled having heard Papodopolos say, "that's a nice set," while preparing the video equipment. (Doc. 30, Ex. K ¶¶ 5, 10.) Ultimately, Papodopolos was demoted as a result of the incident. (Doc. 30 ¶ 30; Doc. 34 ¶ 30.) Hoffman later testified that Papodopolos had threatened him both before and after his interview. Before the interview, Papodopolos allegedly told Hoffman: "[D]o not make any statements that will get me in trouble or there will be problems." (Doc. 34, Ex. 1 at 75, 77.) Hoffman also heard via another officer that Papodopolos had threatened to blow up the homes of all individuals who chose to make statements against his interests. (Id. at 89, 102.)

4

After the interview, Papodopolos allegedly told Hoffman:  "I know what you said . . . and life is going to get harder for you from now on."[5]  (Id. at 78.)

The fifth incident occurred around February of 2004, when Shaffer allegedly denied Hoffman a position on an emergency response team.  (Doc. 30 ¶ 62; Doc. 34 ¶ 62 & Ex. 1 at 111.)  Hoffman was under consideration for the team until Shaffer decided not to form it because of budgetary constraints.  (Doc. 30, Ex. U ¶ 11.)

The sixth incident centers around Hoffman's participation in two non-profit organizations that provide financial assistance to law enforcement officers and their families.  Hoffman founded the Reserve Police Officers Association ("RPOA") in 1998 and co-founded the American Police Officers Association ("APOA") in 2000. (Doc. 30 ¶¶ 11-12; Doc. 34 ¶¶ 11-12 & Ex. 1 at 15.)  At various times, Hoffman has served as president of these associations, and he has received remuneration from them.  (Doc. 30 ¶ 12; Doc. 34 ¶ 12; Doc. 34, Ex. 1 at 16-17.)  On July 9, 2003, Officer Paul Bernier ("Bernier") from a Massachusetts Police Department contacted the Capitol Police regarding Hoffman's familiarity with APOA's fundraising practices. Dougher spoke with Bernier, which Hoffman alleges violated a Capitol Police policy that all calls should be forwarded to the specific officer for which they were intended.  (See Doc. 34 ¶ 18; see also Doc. 34, Ex. 3 ¶ 1.)  Thereafter, Dougher asked Hoffman to contact Bernier and to submit a written response explaining the issues about which Bernier had queried.  (Doc. 30 ¶ 18; Doc. 34 ¶ 18.)  Hoffman complied

---

[5] Papodopolos denies making any threatening statements in connection with the EEO investigation.  (Doc. 30, Ex. L at 32.)

with Dougher's instructions and explained that someone had "hijacked" APOA's name to conduct an "unapproved fundraising campaign" in Massachusetts, but that neither he nor APOA "has ever been criminally charged for any fraud or misrepresentation." (Doc. 34, Ex. 3 ¶ 4.)

Around the same time, Hoffman visited the Department of State's Bureau of Charitable Organizations to determine whether that agency had been investigating APOA's fundraising practices. (Doc. 30 ¶ 31 & Ex. M at 1; Doc. 34 ¶ 31.) When Hoffman arrived, he was not in uniform, but was displaying his Capitol Police badge. He apparently informed a staff person that he was with the Capitol Police but was not conducting official police business and asked to speak to an investigator. (Doc. 34, Ex. 1 at 49.) Ultimately, Hoffman spoke with an investigator named Drew Koser ("Koser"), who informed him that the agency was not investigating APOA. (Doc. 30 ¶ 32; Doc. 34 ¶ 32.) During the discussion, Hoffman allegedly confirmed that he was the president of APOA and provided a business card that identified him as the association's president. According to Koser, Hoffman also asked that all calls about APOA be forwarded to him as "a professional courtesy." (Doc. 30, Ex. M at 1.) After the meeting, Koser filed a complaint with the Office of Inspector General ("OIG"), averring that Hoffman had attempted to use his position as a Capitol Police officer to influence him inappropriately. (Doc. 30 ¶¶ 33, 36; Doc. 34 ¶ 33; see also Doc. 30, Ex. M.)

As a result of Koser's complaint, the OIG launched an investigation into Hoffman's affiliation with APOA and RPOA. In November 2003, the OIG

interviewed Hoffman and took a written statement from him.  (Doc. 30 ¶¶ 34-35;

Doc. 34 ¶¶ 34-35; Doc. 34, Ex. 1 at 50, 55-56.)  On February 24, 2004, the OIG issued a

report that recommended that Hoffman be disciplined by the Department for his

inappropriate behavior.  (Doc. 30 ¶¶ 36-37; Doc. 34 ¶¶ 36-37; see also Doc. 30, Ex. E

¶ 3, Ex. F ¶ 4, & Ex. N.)  Specifically, the OIG made the following findings:

> Based on its investigation, the OIG finds that Hoffman
> - served as the President of and received compensation from the
>   Reserve Police Officers Association (RPOA) while employed as a
>   Capitol Police Officer;
> - served as the American Police Officers Association (APOA) President
>   while employed as a Capitol Police Officer;
> - failed to file a supplementary employment request form;
> - conducted APOA business wearing plainclothes, his Pennsylvania
>   state identification and his Capitol Police badge;
> - used his Commonwealth e-mail to conduct RPOA and APOA business;
>   and
> - provided misleading and inaccurate information to the OIG.

(Doc. 30, Ex. N at 2.)  After its initial review of the OIG report, the Department

elected to conduct pre-disciplinary conferences ("conferences") before deciding

whether to discipline Hoffman.  (Doc. 30 ¶ 39.)  Hodge, the Department's labor

relations coordinator, was assigned to conduct these pre-disciplinary conferences.

(Doc. 30, Ex. H at 10, 49-50.)

Meanwhile, on March 1, 2004, Hoffman and three other officers sent a

memorandum to Speaks and several other Department officials.[6]  The

---

[6] Speaks denies receiving the letter, claiming that he learned of its existence
during the instant litigation.  (Doc. 30 ¶ 49 & Ex. F ¶¶ 9-10.)  Hodge became aware of
the letter during the course of the conferences and received a faxed copy from
Hoffman on April 29, 2004.  (Doc. 30 ¶ 53; Doc. 34 ¶ 53.)  The remaining defendants
did not learn of the letter's existence until the instant litigation.  (See Doc. 30, Ex. E
¶ 8, Ex. G at 38, Ex. I ¶ 7, Ex. J ¶ 4, Ex. L at 40, & Ex. U ¶ 6.)

memorandum contained various complaints about harassment, violence, and retaliation in the Capitol Police.  It named Hodge, Shaffer, Dougher, Marzullo, and Papodopolos among the alleged wrongdoers.  (Doc. 30 ¶ 48 & Ex. T; Doc. 34 ¶ 48.) Two days after sending the memorandum, Hoffman received written notice that the first conference about the OIG report would be held on March 16, 2004.  (Doc. 30, Ex. O; see also Doc. 1 ¶ 42; Doc. 24 ¶ 42.)  The notice was signed by Human Resources Director Green, and it summarized the charges against Hoffman. (Doc. 30 ¶ 39; Doc. 34 ¶ 39.)  During the first conference, Hoffman attempted to invoke his rights under federal and state whistleblower laws, believing that the conference was simply retaliation for his March 1, 2004 memorandum.  (Id.; Doc. 1 ¶ 43; Doc. 24 ¶ 43.)  Hodge allegedly replied that whistleblower laws were inapplicable to Hoffman's situation.  (Doc. 34 ¶ 39.)  Hoffman vaguely memorialized his attempt to invoke the protection of whistleblower laws in an email to his supervisor the following day.  (Doc. 34, Ex. 1 at 95, 146 & Ex. 10.)

Three additional conferences were held on March 29, 2004, April 29, 2004, and August 9, 2004.  (Doc. 30 ¶¶ 40, 43 & Ex. R; Doc. 34 ¶¶ 40, 43.)  Hoffman claims that at some point during the conferences Hodge observed:  "[Y]ou're on the list and you're going to get out of here one way or the other."[7]  (Doc. 34, Ex. 1 at 107.) Immediately following the March 29, 2004 conference, Hoffman filed a grievance contesting the conference procedures.  (Id. at 123-25.)  On July 21, 2004, Hoffman

---

[7] The "list" referenced in this statement is allegedly a list of officers who had been deemed trouble-makers by a non-defendant Capitol Police officer.  (See Doc. 1 ¶ 40; Doc. 30, Ex. T.)

drafted a letter to Senator James J. Rhoades expressing his complaints regarding the Capitol Police.  (Doc. 34, Ex. 6.)  Senator Rhoades forwarded the letter to Cunningham, who responded by stating that an investigation against Hoffman was pending.  (Doc. 34, Ex. 1 at 94.)  On the same day, Hoffman expressed his complaints at a Pennsylvania Black Caucus meeting that was attended by Green, Speaks, and Shaffer.  (Doc. 34, Ex. 1 at 108.)  Hoffman was later told by a fellow officer that Green was upset with him and that his presentation to the caucus would not "bode well" for his career.  (Id. at 109.)

After the August 9, 2004 conference, Hodge and Green attempted to arrive at a recommended punishment for Hoffman.  (Doc. 30, Ex. G at 10-11.)  Ultimately, Hodge and Green recommended a two week suspension without pay, which Speaks authorized on August 17, 2004.  Hoffman's suspension letter detailed the grounds

for the chosen punishment, which mirror the findings of the OIG report.[8]  (Doc. 30

¶¶ 45-46; Doc. 34 ¶¶ 45-46.)  Cunningham concurred in Speaks' decision to suspend

Hoffman.  (Doc. 30 ¶ 54; Doc. 34 ¶ 54.)  On September 4, 2004, Hoffman filed a

grievance protesting his suspension.  (Doc. 34, Ex. 1 at 92, 125-26.)

The final incident centers around Hoffman's medical condition.  Since late

2002, Hoffman has been suffering from back problems that rendered him unable to

wear a bulletproof vest.  (See Doc. 34, Ex. 1 at 95.)  Between March and July of 2004,

---

[8]  Specifically, the suspension letter concludes that Hoffman:

- **Provided misleading and contradictory information** regarding your involvement with APOA . . . and RPOA . . . during an OIG . . . investigation and during investigatory meetings with the Department . . . .  During these meetings you indicated you stopped acting as the President of APOA when you began your employment with the Department . . . and that you no longer worked for RPOA.  However, since you have been employed as a Capitol Police Officer, you sent e-mails as the President of APOA, signed agreements on behalf of APOA with three states regarding APOA fundraising irregularities, gave a business card listing you as President of APOA to a Department of State employee, signed contribution letters as the President of APOA, and received monetary compensation from RPOA.
- **Conducted APOA business during work hours or while displaying your Capitol Police Badge while wearing civilian clothes and without obtaining approval.**
  - On June 5, 2003, while clearly displaying your Capitol Police Badge, you acted in a capacity as an official of the APOA when you . . . asked the Bureau of Charitable Organizations to forward calls it received about the APOA to you as a "professional courtesy".
  - You sent four e-mails using Commonwealth computers during your work hours in which you were conducting APOA or RPOA business.
  - You failed to file Supplemental Employment forms even though you were receiving compensation from RPOA.
- **Scandalous Behavior**.  As a result of complaints filed by three States' Attorney General Offices regarding APOA fundraising irregularities you [signed settlement agreements on behalf of APOA].

(Doc. 30, Ex. S.)

Hoffman suffered additional injuries to his back, neck, and wrist which caused him to miss several extended periods of work.  (Doc. 30 ¶¶ 42, 44; Doc. 34 ¶¶ 42, 44.)  On October 20, 2004, Hoffman was placed on administrative leave as a result of his medical restrictions.  (Doc. 1 ¶ 51; Doc. 24 ¶ 51.)  On March 31, 2005, Hoffman was offered a disability retirement in a letter signed by Hodge on Green's behalf. (Doc. 30 ¶ 2; Doc. 34 ¶ 2; Doc. 30, Ex. V.)  Hoffman voluntarily accepted the retirement on April 18, 2005.  (Doc. 30 ¶ 2 & Ex. W; Doc. 34 ¶ 2.)

On May 3, 2005, Hoffman filed the instant action.  (See Doc. 1.)  Hoffman's only remaining claim is that defendants violated his First Amendment rights as protected by 42 U.S.C. § 1983.[9]  Defendants filed the instant motion for summary judgment, which has been fully briefed and is ripe for disposition.

## II.   __Standard of Review__

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v.

---

[9] Hoffman's complaint includes claims of civil rights violations pursuant to 42 U.S.C. §§ 1981, 1985, and 1986, substantive due process violations pursuant to § 1983, and assault and battery and intentional infliction of emotional distress pursuant to state law.  However, Hoffman conceded that his § 1981, § 1985, § 1986, and assault and battery claims are not supported by law, so the court dismissed them.  (See Doc. 23 at 2 n.2, 4 n.4.)  In addition, the court granted defendants' motion to dismiss with respect to Hoffman's substantive due process and intentional infliction of emotional distress claims.  (See Doc. 23 at 9-11.)

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment concurrently.  InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); see also Irvin v. United Mine Workers of Am. Health & Ret. Funds, No. 05-1072, 2007 WL 539646, at *1 (W.D. Pa. Feb. 15, 2007); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; see also Strategic Learning, Inc. v. Wentz, No. 05-467, 2006 WL 3437531, at *4 (M.D. Pa. Nov. 29, 2006).

## III.    **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law by state officials.  See 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id. Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."[10] Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including police officers and other state actors performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); Saucier v. Katz, 533 U.S. 194, 200-01 (2001). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In Saucier, the Supreme Court explained the analytical process for determining when to apply the privilege of qualified immunity:

---

[10] Defendants apparently concede for purposes of the instant motion that they were acting "under color of state law" at all times relevant hereto.

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?  This must be the initial inquiry . . . .  If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

Saucier, 533 U.S. at 201.  Thus, the qualified immunity analysis requires a two-step inquiry.

> First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right.  If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established."  If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity.

Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006); cf. Wright v. City of Phila., 409 F.3d 595 (3d Cir. 2005) (discussing whether the constitutional violation is a separate inquiry or part of the qualified immunity analysis); Kaucher v. County of Bucks, 455 F.3d 418, 423 n.2 (3d Cir. 2006).

When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for purposes of immunity.  See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the]

assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

Proceeding under the above framework, the court will consider, first, whether Hoffman has offered prima facie evidence to support his First Amendment retaliation claims and, second, whether defendants enjoy qualified immunity on those claims for which Hoffman has presented sufficient evidence.

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006). To state a prima facie claim of retaliation, the plaintiff must allege that: (1) the activity in question is protected by the First Amendment, (2) the defendants responded with retaliation, and (3) the protected activity was a "substantial factor" in the alleged retaliation. See Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006); see also Chambers v. Pennsylvania, Civ. A. No. 1:04-CV-0714, 2006 WL 3831377, at *7 (M.D. Pa. Dec. 28, 2006); Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001). A defendant can rebut a prima facie case of retaliation by showing that "the same adverse action would have taken place in the absence of the protected conduct." Chambers, 2006 WL 3831377, at *7; see also Baldassare, 250 F.3d at 194. Whether the activity is protected is a question of law, while the remaining inquiries are questions of fact. Hill, 455 F.3d at 241.

## A.     Protected Activity

A public employee's statement is a protected activity if: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." Id. (quoting Garcetti, 126 S. Ct. at 1958).  In the matter *sub judice*, Hoffman alleges that he spoke as citizen about a matter of public concern by: (1) compiling a report regarding the union investigation of Dougher, (2) complaining to his superiors about smoking in the lunchroom, (3) providing a statement to the EEO regarding a training video, (4) complaining to his superiors about unlawful practices, harassment, and retaliation via the March 1, 2004 memorandum, (5) invoking the protection of whistleblower laws, (6) filing an employee grievance, (7) voicing his concerns regarding Capitol Police corruption at a Black Caucus meeting, and (8) sending a letter regarding Capitol Police corruption to Senator Rhoades.[11]

### 1.     Speaking as a Citizen

When a public employee's statement is made "pursuant to . . . official duties," the employee is not speaking as a citizen. Garcetti, 126 S. Ct. at 1960.  Defining the

---

[11]  Hoffman also alleges that his August 2002 verbal complaint to Marzullo regarding his altercation with Shipp constituted a protected activity.  Given Hoffman's admission that he no longer recalls making such a complaint, the court finds that Hoffman has failed to establish that his verbal complaint to Marzullo constituted a protected activity.  See supra Part I at 2-3 (discussing the first incident of retaliatory harassment alleged by Hoffman).

scope of an employee's duties involves a "practical" inquiry that is not dependent upon the technical limitations of an employee's job description.  Id. at 1961-62.  With respect to Hoffman's investigation of Dougher, the court finds that Hoffman was speaking as a citizen because he conducted the investigation "in his capacity as a union representative, rather than in the course of his employment" as a Capitol Police officer.  Shirden v. Cordero, 509 F. Supp. 2d 461, 466-67 (D.N.J. 2007) (quoting Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006)); see also Glass v. Snellbaker, No. 05-1971, 2007 WL 1723472, at *4 (D.N.J. June 14, 2007) ("[N]othing in the Garcetti case casts doubt upon the First Amendment associational protections of public employees expressing themselves through lawful union activities, such as meetings and grievances.").  Unfortunately, the record is devoid of evidence sufficient to permit a "practical" inquiry into whether Hoffman's remaining activities were conducted within the scope of his official duties as a Capitol Police officer.  See Foraker v. Chaffinch, 501 F.3d 231, 239-243 (3d Cir. 2007) (conducting a multi-circuit survey of cases premising a finding that an individual's speech fell within the Garcetti rule on either a detailed, fact-sensitive analysis of the individual's job responsibilities or an "undisputed fact" establishing the scope of the individual's duties).  Accordingly, the court must assume for purposes of the instant analysis that Hoffman was speaking as a citizen when he engaged in the allegedly protected activities.

2.    **Public Concern**

The court turns next to the second element of the protected activity analysis,

namely whether the plaintiff's statements involved issues of public concern.  A

public employee's speech involves a matter of public concern if "it can be fairly

considered as relating to any matter of political, social or other concern to the

community."  Hill, 455 F.3d at 243 n.25.  In determining if speech is a matter of

public concern, the court must consider the "content, form, and context of a given

statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147-48

(1983).  Speech generally involves a matter of public concern if it "attempts to bring

to light actual or potential wrongdoing or breach of public trust on the part of

government officials."  Baldassare, 250 F.3d at 195.

Considering the "content, form, and context"of Hoffman's complaint to his

superiors regarding smoking in the workplace, the court finds that Hoffman was

advancing his own personal interests, rather than the interests of the public, when

he made the complaint.  See Connick, 461 U.S. at 147-48.  In so finding, the court is

persuaded by the reasoning of the Seventh Circuit Court of Appeals in Smith v.

Fruin, 28 F.3d 646 (7th Cir. 1994).  In Smith, the plaintiff made workplace

complaints regarding his exposure to second-hand smoke.  The court held that his

complaints implicated matters of personal rather than public concern because the

relief he requested, namely that he no longer be exposed to second-hand smoke,

was individual in nature.  Id. at 651-52; see also Thomas v. City of Memphis, No. 04-

2314, 2005 WL 1921804, at *4-*5 (W.D. Tenn. Aug. 3, 2005) (finding workplace

18

complaints regarding second-hand smoke to be personal in nature).  In reaching its decision, the <u>Smith</u> court relied upon the fact that the plaintiff's complaints "did not cite any difficulties experienced by other non-smokers [or] purport to speak on behalf of anyone but [the plaintiff]."  28 F.3d at 651.  Like the plaintiff in <u>Smith</u>, Hoffman complained about smoking in the workplace on his own behalf.  <u>See id.</u> at 651-52.  In his deposition testimony, Hoffman explained that his complaints were prompted by the fact that he was required to eat in a windowless, smoke-filled room.  Notably, he did not go on to cite a concern for other employees or for the societal effects of second-hand smoke as rationales for his complaint.  (Doc. 34, Ex. 1 at 67-68.)  To the contrary, Hoffman confirmed that he researched the state policy on smoking in workplaces and determined that his singular aversion to smoking was sufficient foundation for a complaint.  (<u>Id.</u> (stating that his research revealed that "if one person does not want people smoking in an area, they can request it to be nonsmoking")).  Accordingly, the court finds that Hoffman's complaints regarding smoking in the workplace do not meet the definition of protected activity because they addressed matters of personal rather than public concern.

Similarly, the court finds that Hoffman's March 17, 2004 reservation of rights email and March 29, 2004 employee grievance were personal in nature.  Examining the content of the email reveals that it was intended to preserve Hoffman's individual rights rather than to reveal issues of public concern.  While the email clearly states Hoffman's intent to "affirm[] [his] rights under [the whisleblower act]," it is vague in its allegations of improper conduct and does not "divulge

details" of any matters of public concern.  (See Doc. 34, Ex. 10.)  The context of the

message lends credence to this conclusion because the message is limited in its

audience to individuals in Hoffman's chain of command whom internal regulations

dictate be notified to preserve Hoffman's rights.  (See id. (stating that Hoffman

chose the recipients for the email "because we are required to use our chain of

command" by a management directive regarding the whistleblower act)).  Similarly,

the employee grievance addressed Hoffman's specific concerns with the pre-

disciplinary conference process rather than more generalized allegations of corrupt

investigatory practices.  (See Doc. 34, Ex. 1 at 123-25.)  For example, Hoffman's

grievance alleges that, during the course of the conferences, Hodge refused to

provide Hoffman with the written statement he had authored during the OIG

investigation.  (Id. at 123.)  The court finds that this and other concerns expressed in

Hoffman's grievance are so narrowly tailored to Hoffman's particular employment

situation that they cannot be matters of public concern.  See Myers v. County of

Somerset, 515 F. Supp. 2d 492, 502-03 (D.N.J. 2007) (holding that an employee's

statements regarding "threatening and intimidating" conduct directed exclusively

towards him did not address matters of public concern because they "pertained

solely to [the employee's] own employment situation"); see also Muzslay v. City of

Ocean City, 238 F. App'x 785, 789 (3d Cir. 2007) (affirming district court's decision

that statements regarding an abrogation of a particular employee's authority

involved that employee's "own personal employment situation" and did not involve

matters of public concern).  Accordingly, neither Hoffman's reservation of rights email nor his employee grievance qualify as protected activities.

Nevertheless, the court finds that Hoffman has satisfied the public concern element of the prima facie case with respect to his remaining allegations.  Given its strong similarities to hearing testimony, Hoffman's statement during the EEO process qualifies as a matter of public concern.  See Green v. Phila. Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1997) (stating that the context of a hearing "raises speech to a level of public concern, regardless of its content"); Pro v. Donatucci, 81 F.3d 1283, 1290 (3d Cir. 1996) (advancing the public policy argument that fear of retribution could inhibit witnesses from testifying truthfully if testimony were not a matter of public concern).  The four remaining activities – the investigatory statement regarding the Dougher investigation, the March 1, 2004 memorandum, the letter to Senator Rhoades, and the statements at the Black Caucus meeting – implicate matters of public concern because they address perceived corruption within the Capitol Police.  See Baldassare, 250 F.3d at 197 ("Needless to say, allegations of corrupt practices by government officials are of the utmost public concern.").

### 3. **Balancing of Interests**

Having deemed five of Hoffman's eight expressive activities to implicate matters of public concern, the court turns to the final element of the protected activity inquiry.  To determine whether defendants had adequate justification for treating Hoffman differently from a member of the general public, the court must balance "the interests of the employee . . . in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Barry v. Luzerne County, 447 F. Supp. 2d 438, 445 (M.D. Pa. 2006). When the employee speaks in a public forum, the court must consider not only the employee's interest in the speech but also "the public's interest in access to the information." Id. at 446. If the balance weighs in favor of the employer, the speech is unprotected. See Shingara v. Skiles, No. 04-0621, 2007 WL 210800, at *5 (M.D. Pa. Jan. 24, 2007); see also Ober v. Evanko, 80 F. App'x 196, 200 (3d Cir. 2003). In determining the government's interest, the court should consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, . . . impedes the performance of the speaker's duties, or interferes with the regular operation of the enterprise." Barry, 447 F. Supp. 2d at 445-46. Law enforcement agencies are generally given "wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks." Devlin v. Blackmon, No. 05-6081, 2007 WL 1853144, at *2 (E.D. Pa. June 26, 2007) (quoting Ober, 80 F. App'x at 201). In weighing the extent of the detrimental impact on a close working relationship, the "proximity within the organizational hierarchy between the employer and the employee is particularly important." See Shingara, 2007 WL 210800, at *6 (quoting Muti v. Schmidt, 118 F. App'x 646, 648 (3d Cir. 2004)).

On Hoffman's side is the public's strong interest in uncovering wrongdoing by public officials, such as police officers.  Id.  On the defendants' side is the strong interest of the Capitol Police in regulating employee speech that could have a detrimental impact on efficient law enforcement.  See Barry, 447 F. Supp. 2d at 445-46.  Because the court will grant defendants' motion for summary judgment on other grounds, the court need not resolve the delicate issue of the respective strengths of these interests.  See infra Parts III.B-C.

### B.    Retaliatory Action

To qualify as retaliatory, an employer's conduct must adversely affect an employee's First Amendment rights.  Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003); see also Breiner v. Litwhiler, 245 F. Supp. 2d 614, 632-33 (M.D. Pa. 2003) (holding that conduct must be sufficient "to deter a person of ordinary firmness from engaging in the First Amendment-protected activity" in order to qualify as retaliatory).[12]  Determining whether a plaintiff's First Amendment rights were

---

[12]  In 2006, the Supreme Court modified the definition of retaliatory actions in claims asserted pursuant to Title VII.  See Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006).  The new standard announced by the Court requires a Title VII plaintiff to "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 2415.  While it remains unclear whether the Court intended this new standard to apply with equal force to First Amendment retaliation claims, Third Circuit jurisprudence makes this a distinction without a difference.  See Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (discussing the Third Circuit's person of ordinary firmness standard).  See generally John Sanchez, The Law of Retaliation After Burlington Northern and Garcetti, 30 AM. J. TRIAL ADVOC. 539, 565-66 (2007) (stating that the Burlington standard is "strikingly similar if not identical" to the Third Circuit's person of ordinary firmness standard).

adversely affected is a "fact intensive inquiry focusing on the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Brennan, 350 F.3d at 419.  Retaliatory acts must be "more than *de minimis* or trivial" to have an adverse effect on an employee's First Amendment rights. Id.; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  Decisions relating to "promotion, transfer, recall and hiring" are significant enough to qualify as retaliatory, while "criticism, false accusations, or verbal reprimands" are not. Brennan, 350 F.3d at 419.

In the instant case, Hoffman alleges that defendants retaliated against him by:  (1) placing anonymous threats and cheese in his mailbox, (2) making various verbal statements that were against his interests, (3) denying him a position on an emergency response team, (4) answering telephone calls that were intended for him, (5) conducting an internal investigation of his conduct, (6) suspending him for two weeks without pay, and (7) offering him an early retirement.  The court will address these allegedly retaliatory actions *seriatim.*

With respect to the items that were placed in Hoffman's mailbox, Hoffman admits that he is unable to establish that any of the individual defendants were personally involved in that incident.  (See Doc. 34, Ex. 1 at 69, 71-72.)  Accordingly, the incident cannot form the basis of a constitutional claim.  See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) ("A[n individual] defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . .").

Turning to the verbal statements of the various defendants, the court finds that these statements are too trivial to constitute retaliatory action.  See Brennan, 350 F.3d at 419 (stating that "criticism, false accusations, [and] verbal reprimands" do not rise to the level of actionability under the First Amendment); see also McKee, 436 F.3d 165, 170 (3d Cir. 2006) (holding that "not every critical comment—or series of comments—made by an employer to an employee" provides a basis for a First Amendment violation).  In the instant case, Marzullo allegedly admonished Hoffman to "mind his own business" and to "be careful working here" after Hoffman lodged two separate employee complaints of workplace misconduct. (See Doc. 1 ¶ 29; Doc. 34, Ex. 1 at 70.)  At most, these statements amount to verbal reprimands, which do not rise to the level of actionability under the First Amendment.  Brennan, 350 F.3d at 419.  Similarly, Green's statement that Hoffman's participation in the Black Caucus meeting would not "bode well" for his career was at most a tenuous and non-actionable criticism of Hoffman's decision to attend the meeting.  Id.  While the remaining verbal statements appear to involve direct or veiled threats against Hoffman,[13] this court has repeatedly held that even verbal threats are insufficient to qualify as retaliatory actions.  See Alexander v. Forr, No. 04-370, 2006 WL 2796412, at *4 (M.D. Pa. Sept. 27, 2006) ("Verbal abuse or threats do not constitute the type of adverse action sufficient to support a retaliation

---

[13]   The remaining statements are those made by:  (1) Dougher following the union investigation, (2) Papodopolos in connection with the EEO investigation, and (3) Hodge in connection with the pre-disciplinary conferences.  See supra Part I at 3-5, 8.

claim."); <u>Bartelli v. Lewis</u>, No. 04-0908, 2005 WL 2406048, at *2 (M.D. Pa. Sept. 29, 2005) ("[W]e determine that verbal threats do not constitute an 'adverse action' and, therefore, do not fulfill a requisite element of a retaliation claim."); <u>Bartelli v. Bleich</u>, No. 04-0899, 2005 WL 2347235, at *3 (M.D. Pa. Sept. 26, 2005) ("[M]ere verbal threats cannot be viewed as an 'adverse action' sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."); <u>see also</u> <u>Reid v. Wakefield</u>, No. 06-249, 2007 WL 954179, at *4 (W.D. Pa. Mar. 28, 2007) ("Verbal threats, whether acted upon or not, simply will not be sufficient to state a First Amendment claim."); <u>Gay v. City of Phila.</u>, No. 03-5358, 2005 WL 1844407, at *5 (E.D. Pa. Aug. 2, 2005) ("[I]t is well-established that verbal abuse or threats alone do not state a constitutional claim."). Accordingly, the verbal statements directed at Hoffman by a number of defendants are insufficient to give rise to a retaliation claim.

The court turns next to Shaffer's decision not to place Hoffman on the emergency response team and Dougher's decision to answer a telephone call intended for Hoffman. The court also finds these actions to be insufficient to deter "a person of ordinary firmness" from engaging in a First Amendment-protected activity. <u>See</u> <u>Breiner</u>, 245 F. Supp. 2d at 632-33. Both decisions amount to the type of routine employment practices that are an anticipated component of every workplace. Permitting Hoffman to premise a First Amendment claim on such practices would make even the most minor employment decisions the potential subjects of retaliation claims. In addition, there is no evidence of record to suggest

that either decision had any adverse effect on Hoffman.  See Suppan v. Dadonna,

203 F.3d 228, 235 (3d Cir. 2000) ("Section 1983 is a tort statute.  A tort to be

actionable requires injury.").  Hoffman has failed to suggest that his lack of

membership on an emergency response team had any negative ramifications,

whether personal or professional.  Nor has Hoffman presented any evidence

sufficient to link the information garnered by Dougher during the telephone call

with the subsequent investigation of his association with APOA and RPOA.  To the

contrary, the evidence of record clearly indicates that the investigation was

launched by the OIG without any input from the Department or Dougher.  Because

the aforementioned actions are *de minimis* and did not cause any constitutional

injury to Hoffman, the court finds that they do not constitute retaliatory actions.[14]

---

[14] Assuming *arguendo* that these acts qualified as retaliatory, Hoffman's claims would still fail for lack of evidence that his protected activities played a substantial role in prompting the activities.  See infra Part III.C.  Neither decision followed so closely after a protected activity to permit a finding of causation based on temporal proximity alone.  Nor does the evidence as a whole give rise to an inference of causation.  With respect to Shaffer's decision not to place Hoffman on an emergency response team, the evidence of record suggests that Shaffer abandoned the concept of forming an emergency response team for neutral budgetary reasons and not out of any retaliatory animus against Hoffman.  Turning to Dougher's decision to answer Hoffman's telephone call, Hoffman has failed to proffer any evidence sufficient to suggest that Dougher's conduct amounted to anything more than commonplace telephone etiquette.  While Hoffman attempts to allege that Dougher's conduct violated a Capitol Police policy requiring all telephone calls to be forwarded to the officer for which they were intended, Hoffman has presented no evidence to establish the existence of such a policy.  Moreover, even if such a policy violation were confirmed, it would not corroborate Hoffman's position that Dougher chose to violate a workplace policy *because* of Hoffman's protected activities.

Having made the foregoing findings, the court will assume for purposes of analysis that the remaining acts alleged by Hoffman are sufficiently retaliatory to satisfy the second element of the prima facie case.  Accordingly, the court will turn to an analysis of the final element - causation.

### C.     Substantial Factor

To establish the causation element of a retaliation claim, a plaintiff must prove that the exercise of his First Amendment rights "played some substantial role" in motivating the retaliatory act.  Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 13, 2006).  However, a plaintiff need not prove that the retaliation was "motivated solely or even primarily by the protected activity."  Id.  If a plaintiff meets this burden, the defendant can rebut the claim of causation by showing that "the same adverse action would have taken place in the absence of the protected conduct."  Chambers, 2006 WL 3831377, at *7; see also Baldassare, 250 F.3d at 194.  The Third Circuit has recently highlighted the importance of a strict interpretation of the causation requirement as follows:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take.

Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007).

The temporal proximity of a retaliatory act to a plaintiff's exercise of his First Amendment rights is probative, but not dispositive, of the causation element of a

retaliation claim.  <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 512 (3d Cir. 2003).  As

the Third Circuit has stated:

> [I]t is causation, not temporal proximity itself, that is an element of plaintiff
> prima facie case, and temporal proximity merely provides an evidentiary
> basis from which an inference can be drawn.  The element of causation,
> which necessarily involves an inquiry into the motives of an employer, is
> highly context-specific.  When there may be valid reasons why the adverse
> employment action was not taken immediately, the absence of immediacy
> between the cause and effect does not disprove causation.

 <u>Kachmar v. Sungard Data Sys., Inc.</u>, 109 F.3d 173, 178 (3d Cir. 1997); <u>see also</u> <u>Marra</u>

<u>v. Phila. Housing Auth.</u>, 497 F.3d 286, 302 (3d Cir. 2007); <u>Farrell v. Planters</u>

<u>Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000).  For temporal proximity alone to

establish causation, the time difference must be so short as to be "unusually

suggestive of retaliatory motive."  <u>Marasco</u>, 318 F.3d at 512.  While the Third Circuit

has not explicitly defined the closeness in time required to be "unusually

suggestive" of retaliatory motive, the court has held that a temporal proximity of

two days was sufficient to establish causation on its own, <u>see</u> <u>Farrell</u>, 206 F.3d at 279

n. 5, while a temporal proximity of tens days was sufficient to establish causation

only when accompanied by other evidence of wrongdoing on the part of the

employer, <u>Shellenberger v. Summit Bancorp., Inc.</u>, 318 F.3d 183, 189 (3d Cir. 2003).

Clearly, the court's analysis of temporal proximity must focus on the factual

circumstances of the individual case.  However, these cases suggest that the

difference in time must be measured in days, rather than in weeks or months, to

establish causation on its own.  When such proximity is lacking, "circumstantial

evidence of a 'pattern of antagonism' following the protected conduct" or any other

suggestions of causation that can be gleaned from the record "as a whole" may also give rise to an inference of causation.  Farrell, 206 F.3d at 280 (quoting Kachmar, 109 F.3d at 177); see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (suggesting that "timing plus other evidence" may be an appropriate test for causation).

In the instant case, Hoffman's suspension and early retirement offer do not so closely follow a protected activity as to be unusually suggestive of causation.  In fact, Hoffman's suspension follows twenty-seven days after the nearest protected activity, while Hoffman's early retirement offer follows more than eight months after the nearest protected activity.  Our sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation.  See Killen v. N.W. Human Servs., Inc., No. 06-4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04-2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05-19, 2007 WL 2769718, at *4 (W.D. Pa. Sept. 20, 2007) (holding that temporal proximity of three months was insufficient to establish causation).  Accordingly, the court must analyze the record "as a whole" for any additional evidence that may give rise to an inference of causation with respect to these retaliatory actions.  Having conducted a thorough

review of the record, the court has found no evidence that gives rise to an inference

of causation.  To the contrary, the evidence establishes that Hoffman's early

retirement offer was prompted by his medical conditions, which caused him to miss

work and which rendered him physically unable to wear essential safety

equipment.  Moreover, the evidence establishes that Hoffman's suspension was

prompted not by his protected activities but by OIG's neutral investigatory

processes.

Hoffman argues that the final retaliatory action – the Department

investigation of Hoffman – was initiated only one day after his March 1, 2004

memorandum and that, accordingly, an inference of causation is created by

temporal proximity alone.  The court finds this argument unavailing.  Hoffman's

argument is premised upon the fact that the investigation was initiated when the

first pre-disciplinary conference was scheduled via letter dated March 2, 2004.

However, Hoffman neglects the fact that the genesis of the Department's

investigation undoubtedly rests with its receipt of the OIG report a full six days

earlier.  The conclusions of the OIG report identify very serious acts of misconduct

on the part of Hoffman which the Department was obligated to pursue.  Because a

reasonable jury could not conclude that the March 1, 2004 memorandum preceded

the initiation of the Department's investigation, the court finds that temporal

proximity fails to give rise to an inference of causation.  Assuming *arguendo* that

temporal proximity did give rise to an inference of causation, such an inference

would only be permissible if Hoffman could demonstrate that the defendants who

were responsible for the retaliatory action were aware of his protected activity.

Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 494 (3d Cir. 2002) (holding that

temporal proximity cannot "be used to show that an employer was aware of the

protected conduct in the first place").  Here, the evidence establishes that Green

and Hodge made the decision to initiate the investigatory process against Hoffman.

(See, e.g., Doc. 30, Exs. O-R.)  It is undisputed that neither Green nor Hodge was

aware of Hoffman's March 1, 2004 memorandum when the investigation was

initiated.  (See Doc. 30, Ex. G at 38, Ex. H at 41; Doc. 30 ¶ 53; Doc. 34 ¶ 53.)  As a

result, the record evidence permits only a single inference, namely that the

investigation was launched because of the OIG report rather than because of

Hoffman's protected speech.

## IV.    **Conclusion**[15]

Having concluded that none of the retaliatory actions suffered by Hoffman

were caused by his protected speech, the court will grant defendants' motion for

summary judgment with respect to Hoffman's retaliation claims.

An appropriate order will issue.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:        January 14, 2008

---

[15]  In light of the court's determination that Hoffman has failed to offer *prima facie* evidence of his retaliation claims, the court need not address the subsequent issue of whether Hoffman's rights were clearly established.  See supra Part III.A (discussing qualified immunity defense).

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERICK HOFFMAN,** | : | **CIVIL ACTION NO. 1:05-CV-0906** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PATRICK DOUGHER, EUGENE** | : | |
| **MARZULLO, PETER PAPODOPOLOS,** | : | |
| **DONALD CUNNINGHAM, MICHAEL** | : | |
| **SHIPP, CHUCK HODGE, GREGORY** | : | |
| **A. GREEN, PETER SPEAKS, and** | : | |
| **RICHARD SHAFFER,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 14th day of January, 2008, upon consideration of the motion for summary judgment (Doc. 29), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  The motion for summary judgment (Doc. 29) is GRANTED.  <u>See</u> FED. R. CIV. P. 56(c).

2.  The Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiff on all claims.

3.  The Clerk of Court is directed to CLOSE this case.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge